**In re George Phillip TOWNSEND, Jr. a/k/a Phil Townsend, Jr.; and Margaret Townsend, Debtors.**

**Bankruptcy No. 88–718–BKC–3P2.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Aug. 11, 1988.

Lansing J. Roy, Keystone Heights, Fla., for debtors.

Earl M. Barker, Jacksonville, Fla., for South Atlantic.

Jerry Funk, Trustee.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

This case is before the Court upon confirmation of debtors' Chapter 12 Plan and upon Motion to Dismiss filed by South Atlantic Production Credit Association ("South Atlantic"). Upon evidence presented at the hearings held April 19, 1988, and June 16, 1988, the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. This Chapter 12 case was filed on March 1, 1988, in the United States Bankruptcy Court for the Northern District of Florida. By order entered April 1, 1988, dealing with venue, the case was transferred to the Middle District of Florida, Jacksonville Division. 84 B.R. 764.

2. The debtors in this case are George Phillip Townsend, Jr., and Margaret Townsend. Mr. Townsend was formerly a debtor in a Chapter 11 case filed in the Northern District of Florida on December 13, 1985. That case was dismissed on February 11, 1988, after the debtor announced

that he was unable to propose a plan which could be confirmed under Chapter 11.

3. On February 23, 1988, George Phillip Townsend, Jr., and George Phillip Townsend, III, his son, entered into a Cash Farm Lease agreement (South Atlantic's Exhibit 10) in which this debtor leased 227 acres of land and 80,000 pounds of tobacco allotment to his son for a fixed annual rental payment of $23,405.00.

4. Approximately one week later, on March 1, 1988, the debtors filed a petition for relief under Chapter 12.

5. The Chapter 12 Plan filed May 4, 1988, contemplates annual payments to the Trustee in the amount of $83,701.00 for three years, with certain payments to secured creditors to continue following the conclusion of the Plan.

6. Under the section entitled "Miscellaneous Provisions of the Plan," the debtors have agreed to pay George P. Townsend, III, an amount equal to the rent provided in the Cash Farm Lease of February 23, 1988. The Plan incorporates the agreement between the father and states that it is also a "shares agreement providing that the parties share both the proceeds of the crops and expenses for producing the crops equally."

7. The primary creditor objecting to confirmation is South Atlantic Production Credit Association owed a total of $906,-522.02 as of June 16, 1988. With respect to this creditor, the Plan proposes to divide the real property of the debtors into five parcels designated as follows:

| Designation | Acreage | Location |
| --- | --- | --- |
| Parcel A | 315 | Suwannee County |
| Parcel B | 287 | Suwannee County |
| Parcel C | 120 | Suwannee County |
| Parcel D | 80 | Madison County |
| Parcel E | 72 | Suwannee County |

8. In Class 5, the debtors state that they will "abandon" Parcels B and C to South Atlantic pursuant to 11 U.S.C. § 1225(a)(5)(C). The debtors will retain parcels A, D and E and propose payment to South Atlantic in the amount of $326,441.95 amortized over twenty-five years with ten percent interest. This would result in annual payments of $35,963.48.

9. The Plan also provides that the debtors will abandon to South Atlantic 1982 Chevrolet Pick-up Truck, 1976 Killibrew Trailer, 1974 Mack Truck, 1977 Ford Spreader Truck, and stock in South Atlantic Production Credit Association. The debtors will retain the remainder of the equipment subject to South Atlantic's lien and will pay $35,100.00 or "whatever value is eventually assessed by the Court over a five year period at ten percent interest." Assuming the $35,100.00 figure is used, the resulting annual payments would be $9,259.29.

10. The Court received testimony as to the value of the real property from appraisers Andrew V. Santangini, Jr., and Darrel W. Hunt. Mr. Santangini is a member of the American Institute of Real Estate Appraisers and has been engaged in the business of appraising real property for a period in excess of nineteen years. The Court received into evidence (South Atlantic's Exhibit 17) an extensive report analyzing, comparing, and reconciling various comparable sales upon which he relied in formulating his value opinion.

On the other hand, Mr. Hunt has been a real estate broker for only four years and has only been an appraiser since 1986. The Court finds that he did not conduct as extensive an analysis of the debtors' property as Mr. Santangini and failed to include in his valuation several improvements on Parcel A which were included in Mr. Santangini's report.

11. The Court finds that the opinion of values of Mr. Santangini are more reliable than that of Mr. Hunt and his opinions are accepted by the Court as follows:

| Parcel | Amount |
| --- | --- |
| Parcel A | $340,500.00 |
| Parcel B | $207,800.00 |
| Parcel C | $69,000.00 |
| Parcel D | $16,000.00 |
| Parcel E | $53,300.00 |

In summary, the Court finds the fair market value of the real property to be retained by the debtors is $409,800.00 and the value of the real property to be abandoned is $276,800.00.

12. The Court finds that the value of the tobacco allotment owned by the debtor, George P. Townsend, Jr., is $48,000.00 and that such value should be included in the valuation of the real property based upon the unrebutted testimony of Julius D. Davenport.

13. The Court also heard testimony from two appraisers with respect to the value of equipment which the debtors will retain under Class 6 of the Plan. Darrel W. Hunt, testifying for the debtors, opined that the property had a value of $35,100.00. Donnie Roberts, an expert called by South Atlantic, has many years of experience in appraising, buying and selling agricultural equipment and is currently employed by the auction company consulted by Mr. Hunt in reaching his conclusion. He testified that the value of the equipment was $65,600.00. The Court finds the testimony of Mr. Roberts to be very reliable. Accordingly, the Court finds the fair market value of the personal property to be retained under the Plan to be $65,600.00.

14. No testimony was offered at the confirmation hearing with respect to the value of three trucks and one trailer which the debtors will be abandoning to South Atlantic. Accordingly, the Court will not value such property.

15. The debtors will also be abandoning under the Plan their stock equity interest in South Atlantic. According to the evidence, that stock has a liquidation value of $72,650.00.

16. The allowed amount of South Atlantic's secured claim is $872,850.00 less the $54,738.05 senior secured claim of the United States Small Business Administration, leaving a balance due of $818,111.95.

17. The Plan proposes an interest rate for payment to South Atlantic of ten percent per annum. The Court received testimony from three witnesses with respect to interest rates. Dennis O'Steen, an officer of First Federal Savings Bank in Suwannee County, Florida, testified on behalf of the debtors and stated that a standard agricultural real estate loan interest rate calls for eleven percent interest per annum based upon good credit history and a satisfactory seventy percent ratio of loan to value. The interest rate for a loan similar to that proposed by the debtors, if it were available, would be twelve to thirteen percent per annum.

18. Robert J. Tanner, Chairman and Chief Executive Officer of Sun Bank of North Florida, N.A., testified on behalf of South Atlantic and offered his opinion that a fair market interest rate for the loan proposed by the debtors would be a floating rate at not less that prime plus three percent. In this case, that would be twelve percent as of the petition date. Mr. Tanner also stated that a twenty-five year real estate loan as proposed by the debtors is currently unavailable. Mr. Tanner testified that a fair market interest rate for an equipment loan such as that proposed under the plan would be between sixteen and seventeen percent.

19. Julius D. Davenport testified that South Atlantic would not make a loan secured by real estate for a term greater than ten years. He agreed that its sister institution, the Federal Land Bank of Columbia, would make such a loan to a credit worthy borrower with a seventy percent loan to value ratio at a interest rate of 13.35% per annum, provided the term of the loan did not exceed twenty years. Mr. Davenport further stated that South Atlantic would deem a fair structuring of the equipment loan to include thirteen percent interest payable over a three year period.

20. The Court reconciles this testimony and finds that a fair market interest rate for the real estate loan proposed for South Atlantic under Class 5 of the Plan is thirteen percent with a maximum term of twenty years. The Court finds that the fair market interest rate for the equipment loan proposed under Class 6 of the Plan is thirteen percent paid over a three year period. Therefore, the present value of the cash payments to be made to South Atlantic will be determined by using these figures.

21. The value, as of the effective date of the Plan, of the property to be distributed to South Atlantic on account of its secured claim under the Plan is as follows:

| Description | Amount |
|---|---|
| Parcel B | $207,800.00 |
| Parcel C | $69,000.00 |
| Present value of Class 5 payments | $263,611.77 |

| Description | Amount |
|---|---|
| Present value of Class 6 payments | $60,866.09 |
| South Atlantic Stock | $72,650.00 |
| Total | $673,927.86 |

22. Payments required to be made to South Atlantic based upon the Court's findings as to Class 5 totals $403,061.95 and the annual payment required to fund such a plan at an interest rate of thirteen percent is $57,377.40. Similarly, the total amount which must be paid to South Atlantic under Class 6 as to the personal property is $65,600.00, which would require annual payments of $27,783.04 for three years.

23. The annual payments which would be required to be paid to secured creditors based upon the foregoing findings and the provisions of the Plan are as follows:

| Class | Claimant | Amount |
|---|---|---|
| 1 | Debtor's Attorney | $ 6,220.96 |
| 2 | Internal Revenue Service | 3,388.50 |
| 3 | Suwannee County | 3,000.00 |
| 5 | South Pacific (real estate) | 57,377.40 |
| 6 | South Pacific (equipment) | 27,783.04 |
| 7 | Small Business Assoc. | 6,030.39 |
| 8 | GMAC | 3,500.00 |
| 9 | GMAC | 4,080.00 |
| 10 | GMAC | 1,186.72 |
| 11 | Barnett Bank | 5,417.98 |
| | TOTAL | $117,984.99 |

24. During the 1986 crop year, debtor George P. Townsend, Jr., testified that he and his son operated joint farming operations on the same basis as the Cash Farm Lease dated February 1, 1987 (South Atlantic's Exhibit 7). Other than a $1.00 annual rent payment for 556 acres, the 1987 lease recited that "Lessee agrees to share with Lessor on a 50/50 basis, the net proceeds of all crops grown and harvested on the Lessor's land, subject of this Cash Farm Lease."

25. Federal income tax returns for both the debtors and George P. Townsend, III, were admitted into evidence (South Atlantic's Exhibits 5 and 15, respectively). Those returns showed a total net farm profit for all parties in 1986 of $54,043.00.

26. The father and son operated their farm in 1987 under the terms of the Cash Farm Lease dated February 1, 1987. The 1987 income tax returns for both father and son (South Atlantic's Exhibits 4 and 14, respectively) show that the total farming cash flow for their 1987 operations was $48,523.34.

27. All funds used to finance the Townsends' farming operations during 1986, 1987 and 1988 (the current crop year) have been furnished throuugh loans from the United States Farmers Home Administration. All such loans have been made to George P. Townsend, III, not the debtors. The debtors have not joined in the notes as maker, guarantor, or in any other capacity. There is no evidence that such loans will be available to the debtors and there is no legal obligation upon George P. Townsend, III, to continue the farming arrangement which has been in effect for the last two years.

28. The Court has considered a Cash Flow Statement for 1986 and 1987 which George Townsend, III, prepared for the Farmers Home Administration. That Statement projected total crop income of $504,900.00 and total cash operating expenses of $325,960.00, resulting in a projected net income of $178,940.00 for the 1986 crop year, substantially more than the amount which was ultimately realized based upon the income tax returns filed in 1986 and 1987.

29. The Court also considered a second Cash Flow Projection for 1988 prepared by George Townsend, III. It projected a total farm income of $345,500.00 and total cash operating expenses of $256,729.00, result-

ing in a projected income for the overall operation of $97,771.00, with the debtors' share amounting to $48,885.50 (50%) to fund their Plan.

30. The debtors' projection of income for 1988 is inconsistent with their experience during the period they have operated with their son for the past three years. Furthermore, those projections are based in part upon generous and optimistic projections concerning the effect of new, but previously untried, farming operations. Accordingly, those income projections cannot be relied upon for purposes of determining whether the debtors are capable of funding this Plan.

Even if the debtors' projections were accepted by the Court, the funds which they would generate are insufficient to pay the secured claims of creditors. The Court notes that during their operation under the protection of Chapter 12, the debtors have accumulated a total cash reserve of only $2,500.00.

## CONCLUSIONS OF LAW

1. Section 1225 of the Bankruptcy Code sets forth the standards for confirmation of a Chapter 12 Plan. It provides in relevant part:

(a) Except as provided in subsection (b), the court shall confirm a plan if ...

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; or

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

2. In this case, the value of the property to be distributed by the Trustee for the debtors on account of the allowed secured claim of South Atlantic is less than the allowed amount of such claim.

■ 3. Section 1222 does allow the debtors to include in their Plan provisions for the payment of all or part of a claim against the debtors from property of the estate or property of the debtors. However, § 1225(a)(5) authorizes confirmation over the objection of a secured creditor only if the Court finds that all the property securing such claim is surrendered to the creditor or if the plan contemplates the distribution of property having a present value equal to the allowed amount of the secured claim.

The debtors do not propose surrender of all (underlining for emphasis) of the property securing the claim of South Atlantic, and since the value of the property to be distributed under the Plan is less than the allowed amount of South Atlantic's secured claim, the Plan cannot be confirmed over South Atlantic's objection.

■ 4. Based upon the totality of the evidence, the Court concludes that the debtors have failed to prove that they will be able to make the payments due under the plan.

5. The requirements of § 1225(a)(5) and (6) are not satisfied in this case and confirmation of the debtors' Plan will be denied.

6. South Atlantic also raises the question as to whether the debtors have filed this case in good faith. In view of the Court's disposition on other grounds, no ruling is required on this issue.

7. The debtors have stated that they do not wish this case to be converted to Chapter 7, and would opt for dismissal if confirmation was not ordered.

The Court will enter a separate order denying confirmation and dismissing this case in accordance with these findings.